UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNEEK VIRGINIA LOWE, | : | Case No. 1:05-cv-117 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| HAMILTON COUNTY DEPARTMENT | : | |
| OF JOB AND FAMILY SERVICES, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER THAT DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY
JUDGMENT (Doc. 139) IS DENIED**

This civil action is before the Court on Defendants'[1] supplemental motion for

summary judgment (Doc. 139) and the parties' responsive memoranda (Docs. 142, 143).

Defendants move for summary judgement on Plaintiff's remaining claims: Counts I

(disability discrimination - ADA), III (FMLA retaliation), IV (retaliation - Title VII and

ADA), V (Ohio disability discrimination), and VII (Ohio retaliation).

## I.      PROCEDURAL POSTURE AND BACKGROUND FACTS

Plaintiff Uneek Lowe alleges that her former employer, Hamilton County

Department of Job and Family Services ("HCJFS"), denied her reasonable

accommodations for her disability[2] and retaliated against her for filing discrimination

complaints.  (Doc. 2).

---

[1]  Defendants include Hamilton County and Hamilton County Board of County
Commissioners.

[2]  Plaintiff was diagnosed with depression, Attention Deficit Hyperactivity Disorder
("ADHD"), and severe anxiety.  (Doc. 41 at 13-15).

Plaintiff was hired by HCJFS as an Eligibility Technician on January 20, 2000. (Doc. 94, Ex. E, ¶ 2, Attachment 1).  She was primarily responsible for interviewing applicants/recipients to determine their eligibility for public assistance.  (*Id.*, ¶ 5, Attachment 2).  Plaintiff was ultimately terminated on July 7, 2005 for gross misconduct, dishonesty, insubordination, neglect of duty, absence without leave, and failure of good behavior.  (*Id.*, Attachment 191).

Over the course of a seven-year long litigation, the Court has decided two motions for summary judgment, and the case has been on interlocutory appeal to the Sixth Circuit. It is now before the Court on a third motion for summary judgment.

## II.  PLAINTIFF'S REQUEST TO STRIKE PORTIONS OF DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

"A motion to strike is a drastic remedy that should be used sparingly and only when the purposes of justice require."  *Driving Sch. Assoc. of Ohio v. Shipley*, No. 1:92cv83, 2006 U.S. Dist. LEXIS 66018, at *1 (N.D. Ohio Sept. 15, 2006).

After the initial discovery period closed, Defendants sought leave to obtain Plaintiff's social security disability file.[3]  The Court granted Defendants' motion for

_____

[3] "This information goes to several central issues in this case, including but not limited to, judicial estoppel, whether or not Plaintiff is a qualified individual with a disability under the ADA, whether there is a discrepancy between Plaintiff's statement in pursuing benefits from the SSA that she was totally disabled and her ADA claim that she could perform the essential functions of her position, as well as to issues of backpay and frontpay."  (Doc. 135 at 4).  *See also Moody v. Honda of America Mfg., Inc.*, No. 2:05cv880, 2006 U.S. Dist. LEXIS 43092, at *16 (S.D. Ohio 2006) (although in a discrimination case evidence concerning the employee's medical ability to continue to work may not be relevant to the issue of whether the employer violated the law, it may be relevant to the scope and extent of relief available to the employee).

leave to conduct additional discovery and to file a supplemental motion for summary judgment "to address all issues fairly affected by the documentation Defendants ultimately receive from the SSA." (Doc. 135 at 4).

Plaintiff moves to strike portions of Defendants' supplemental motion (Doc. 139) and proposed undisputed facts (Doc. 145), because: (1) the records relied upon in the supplemental motion have been available to Defendants since before discovery began; and (2) are outside the scope of this Court's grant of leave to file a supplemental motion. Specifically, Plaintiff argues that Defendants have had access to the facts upon which they now file this supplemental motion since approximately October 2007, when Plaintiff provided Defendants a broad release to obtain the records. (Doc. 148 at 4).[4]

This Court finds the argument to be a moot point, as Chief Judge Dlott permitted the additional discovery and filing of the supplemental motion. (*Id.* at 7). Additionally, Defendants' arguments *do* "address issues fairly affected by the documentation . . . from the SSA." (Doc. 135 at 4). Therefore, the content of the supplemental motion is within the scope articulated by the Court. Moreover, in consideration of the well established legal principal that cases should be decided on the merits and not on procedural technicalities, the Court will consider all of the facts and arguments presented.

---

[4] Plaintiff requested her file from Social Security, but never received it. (*Id.* at 5). Still, Plaintiff maintains that Defendants had notice of the fact that she applied for disability and should have bought a motion to compel or obtained the documents themselves prior to this stage in the litigation. (*Id.*)

### III.   UNDISPUTED FACTS[5]

The Court incorporates herein the facts articulated in the February 19, 2009 Report and Recommendation.  (Doc. 106 at 1-11).

1.   At the time of her termination, Plaintiff earned an annual salary of $30,098.00.  (Doc. 139, Ex. 15).

2.   Plaintiff received disability benefits from Liberty Mutual.  (*Id.*, Ex. 17A-D).

3.   Plaintiff received disability benefits from the State of Ohio Public Employees Retirement System.  (*Id.*, Ex. 18).

4.   Plaintiff received disability benefits from the Social Security Administration.  (*Id.*, Ex. 19A-D).

5.   To SSA, Plaintiff averred she was disabled, and that the disability began on July 9, 2004.  (*Id.*, Ex. 22).

6.   Dr. Bingham informed the State of Ohio, Rehabilitation Services Commission ("Ohio RSC"), that Plaintiff's ability to tolerate work-place stressors was "very poor."  (*Id.*, Ex. 26).

7.   Plaintiff averred to Ohio RSC that, due to her depression, "every day it's hard to function," and that she is "always tired and have low energy." (*Id.*, Ex. 27).

8.   On January 3, 2005, Plaintiff averred to Ohio RSC that she needed SSDI because she was no longer able to work.  (*Id.*, Ex. 29).

9.   SSA found that Plaintiff was "unable to perform her past work," and that she "should have minimal interaction with others."  (*Id.*, Exs. 38, 39).

_____

[5] *See* Docs. 144 and 145.  Plaintiff points out, and the Court acknowledges, that Defendants did not timely file their Proposed Statement of Undisputed Facts.  While Defendants should be cognizant of Court procedures, the Court declines to strike the late-filed document. Additionally, it is unclear whether the facts that Plaintiff requests be stricken are disputed. Ultimately, the Court concludes that whether or not these facts are disputed is irrelevant to the Court's final analysis, but for purposes of this section, considers them disputed.

10.   Plaintiff was initially denied SSDI, and in April 2005, she filed a Request for Reconsideration, stating "I believe the evidence supports a total disability finding."  (*Id.*, Ex. 40).

11.   Dr. Lahnier averred to SSA that Plaintiff "can't expect herself to function in an environment like a state or federal welfare program."  (*Id.*, Ex. 42).

12.   In June of 2005, Plaintiff averred to SSA that she was "not able to take care of self," that she gets lost and confused when driving, and often loses things of importance.  (*Id.*, Ex. 46).

13.   Dr. Bingham averred to Ohio RSC that Plaintiff had poor people skills, was unable to work and unable to handle any type of stress.  (*Id.*, Ex. 47).

14.   Plaintiff wanted SSDI "so that I can get away from stress of working."  (*Id.*, Ex. 48).

15.   The SSA found that Plaintiff's condition prevented her from doing work which requires "working closely with others."  (*Id.*, Ex. 50).

16.   In a Request for Hearing before the SSA, Plaintiff states "I believe that I am disabled."  (*Id.*, Ex. 53).

17.   Plaintiff reported to Dr. Bernfield that she was not able to work due to pain and depression, and this statement was filed with SSA in support of her SSDI claim.  (*Id.*, Ex. 55).

18.   Plaintiff attempted to work part time in March of 2006 (20 hours per week), and had to quit because of her disability.  (*Id.*, Ex. 58).

19.   In 2007 Plaintiff requested a hearing with the SSA claiming she was "unable to work."  (*Id.*, Ex. 67).

20.   In a Treatment Progress Note offered in support of Plaintiff's application for SSDI, it is noted that Plaintiff "agreed she's not ready to return to work."  (*Id.*, Ex. 68).

21.   To SSA, Dr. Bernfield noted that Plaintiff had been taking some classes and she "thinks it is too much for her."  (*Id.*, Ex. 69).

22.  In a Psychiatric Review conducted by SSA it was determined that Plaintiff "is hostile and aggressively verbally" and that she "does evidence a severe mental disorder, which would severely limit her ability to work and carry out her normal daily activities."  (*Id*., Ex. 70).

23.  The SSA awarded Plaintiff benefits, with an onset of her disability established as July 9, 2004, because she could not work with the general public, part time or otherwise.  (*Id*., Exs. 71, 72).

24.  Plaintiff worked 16 hours per week for Macy's beginning December 2007 and went on a medical leave of absence beginning January 2008, from which she never returned.  (*Id*., Exs. 58, 74A, 74B).

25.  Plaintiff informed SSA that she had to quit this part time position because it was "impossible with my multiple disabilities.  (*Id*., Ex. 75).

26.  Plaintiff stated to Ohio RSC that her disability seriously limits her "work tolerance" and interpersonal skills in terms of employability.  (*Id*., Ex. 80).

27.  To SSA, Dr. Bernfield reported Plaintiff "can be verbally aggressive" and "later regrets what she said."  (*Id*., Ex. 84).

28.  Dr. Merz reported a "heated conversation" he had with Plaintiff when he suggested that she was not disabled, and that Plaintiff "had disagreed angrily and hung up the phone."  (*Id*., Ex. 85).

29.  Plaintiff admitted to SSA that she had been having anger issues and outbursts, including an occasion on which she had applied for a position at LensCrafers, became threatening towards the staff, and the police were called.  (*Id*., Ex. 68, 86).

30.  Dr. Bernfield reported to the SSA that Plaintiff's anger had surfaced again and Thoma Sutton called the police on Plaintiff because she was harassing them, and that Plaintiff had an angry outburst at school during which she "got in [another student's] face."  (*Id*., Exs. 87, 88).

31.  Plaintiff admitted to SSA that she "gets angry easily," and that "she was surprised at her rage."  (*Id*., Exs. 89, 90).

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.  Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007).  A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## V.    ANALYSIS

### A.    Disability Discrimination (Counts I and V)[6]

The ADA[7] provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a *prima facie* case of disability discrimination based upon indirect evidence of discriminatory motive, a plaintiff must show: (1) she is an individual with a disability; (2) she is "otherwise qualified" for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew

---

[6] Federal and state disability discrimination claims are subject to the same evidentiary standards and may be evaluated concurrently. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).

[7] Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

or had reason to know of her disability; and (5) after termination, the position remained open, or the employee was replaced by a non-disabled employee.[8]  *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999).  The second element is the only issue in dispute.

        **1.**    ***Prima Facie* Case**

Plaintiff has the burden to prove qualified individual status.  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  The ADA defines a "qualified individual with a disability as a disabled person 'who can perform the essential functions' of her job, including those who can do so only 'with reasonable accommodation.'"  *Id.* at 801.  To establish the second element of her *prima facie* case, Plaintiff need only demonstrate that she was objectively qualified for the position.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574-76 (6th Cir. 2003).  This inquiry should focus on Plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.  *Id.* at 576.  This Court must evaluate Plaintiff's qualifications and performance *before* the events that prompted her discharge.  *Cline v. Catholic Diocese of Toledo*, 206

---

[8]  It may not be necessary to show that the replacement employee is not disabled. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186, n. 11 (6th Cir. 1996).  "[D]isabilities are diverse," and "replacement of one disabled individual with another disabled individual does not necessarily weaken the inference of discrimination against the former individual that arises through establishment of the five [elements of the *prima facie* case]."  This last element will vary, depending on the precise facts of the case before the court.  *Id.*

F.3d 651, 662-63 (6th Cir. 1999).[9]

Plaintiff submitted evidence that she had been satisfactorily performing her position with HCJFS for several years before the events leading to her termination. (Doc. 103, Attachment 3, ¶ 2). In fact, Plaintiff received progressive raises and promotions, and received bonuses for food stamp accuracy. (*Id.* at ¶ 4). Additionally, Plaintiff's co-workers spoke highly of her. Supervisor Michael Shea recalls Plaintiff doing "a good job" (Doc. 122 at 9), supervisor Kelly Draggoo found Plaintiff to be "very kind," "well spoken, and eager to learn" (Doc. 118 at 12, 22), and supervisor Stephanie Smith was generally satisfied with the quality and quantity of Plaintiff's work and with her problem solving skills, decision-making skills and judgment. (Doc. 41 at 29-30).

However, Defendants argue that Plaintiff is estopped from establishing her qualifications. Specifically, Defendants claim that the representations made by Plaintiff and her physicians to obtain numerous disability benefits from Liberty Mutual, the State of Ohio Public Employees Retirement System ("OPERS"),[10] and the Social Security

---

[9] Defendants argue that the actual holding in *Cline* is, "[w]hen assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." 206 F.3d at 662. "The defendant's nondiscriminatory reason [cannot be used] to assess whether the plaintiff met his *prima facie* case." *Id.* While the Court agrees with this interpretation, it nonetheless finds that in order to examine Plaintiff's evidence independent of Defendants' nondiscriminatory reason, it must evaluate Plaintiff's qualifications and performance *before* the events that prompted her discharge. As this Court previously held, Defendants arguments focus on facts that transpired *during* the events that prompted her discharge. (Doc. 106 at 18).

[10] A "disability" for purposes of OPERS disability benefits means "presumed permanent mental or physical incapacity for the performance of a member's present duty or similar service that is a result of a disabling condition." O.A.C. § 145-2-21(A)(1); Ohio Rev. Code §§ 145.35, 145.362.

Administration ("SSA"),[11] among others, preclude her from contending that she is a qualified individual with a disability.[12]

In *Cleveland v. Policy Management Systems*, the Supreme Court considered this very issue, holding that plaintiffs who filed for SSDI were not automatically estopped from establishing that they were qualified employees under the ADA.  526 U.S. at 805. The Court rejected the Fifth Circuit's conclusion that the plaintiff was judicially estopped from asserting that she was a qualified individual with a disability for purposes of her ADA claim, because she consistently represented to the SSA that she was totally disabled. *Id.* at 800.  "[W]hen the SSA determines whether the individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."  *Id.*  Therefore, "an ADA suit claiming that the plaintiff can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) without it."  *Id.*

"Reasonable accommodation" includes job restructuring, part-time or modified work schedules, reassignment to a vacant position, and acquisition or modification of

---

[11]  In order to be "disabled" for SSDI purposes, an applicant must be incapable of performing her "past relevant work," and she must be found unable to perform any other job existing in significant numbers in the nation's economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(e)-(f), 404.1560(b)-(c)

[12]  Plaintiff has collected in excess of $170,000.00 in disability benefits from August 2004 through December 2010 from these three agencies.  (*See* Doc. 139 at Ed 17A-D, 19A-2).

equipment or devises.  42 U.S.C. § 12111(8).  Under the ADA, employers are required to

reasonably accommodate disabled individuals, unless the accommodation imposes an

undue hardship.[13]  42 U.S.C. § 12112(b)(5).  Failure to reasonably accommodate an

employee with a disability is unlawful under the ADA.  *Id.*  An ADA plaintiff "bears the

initial burden of proposing an accommodation and showing that that accommodation is

objectively reasonable."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir.

2007).  Generally, a disabled employee's request for an accommodation triggers an

employer's duty to participate in the interactive process to attempt to identify an

appropriate accommodation.  *EEOC v. Convergys Mgmt. Group*, 491 F.3d 790, 795 (8th

Cir. 2007).  It is, however, the employee who bears the burden of proving sufficient

information to establish that she has a qualifying impairment that requires

accommodation.  *Id.* at 796.

     Next, Defendants argue that the statements made by Plaintiff and her physicians at

all relevant times show that she was totally, permanently, and continuously disabled from

July 2004 through 2010, and that no modification to her job would have enabled her to

work.  (Doc. 139 at 5-12).  For example, in March 2005, Dr. Bingham noted that Plaintiff

---

     [13]  An "undue hardship" is defined as "an action requiring significant difficulty or
expense, when considered in light of the factors set forth in subparagraph (B)."  42 U.S.C.
§ 12111(1)(A).  These factors include: (1) the nature and costs of the accommodation needed;
(2) the overall financial resources of the facility involved in providing the accommodation;
(3) the overall financial resources of the covered entity; and (4) the type of operation of the
covered entity, including the composition, structure and functions of its workforce.  42 U.S.C.
§ 12111(10)(B).

was totally disabled from her occupation and any other work, and that no modifications

could be made to her job that would allow her to work.  (Doc. 139, Ex. 37).

Plaintiff maintains that she would have been able to return to work by March or

April 2005 with the accommodation of a part-time schedule for approximately 30 days.[14]

(Doc. 91 at 242, 247, 294-95).  However, Defendants denied her request.  (*Id.* at 207,

214-15).  In fact, in 2007, Plaintiff began clerical work for Jobs Plus, and continued to do

so until the time of her deposition taken in November 2007, demonstrating that she was

not totally or permanently disabled for ADA purposes.[15]  (Doc. 91 at 231-32).  While

Defendants point to specific evidence that Plaintiff was totally disabled, Plaintiff provides

evidence of the evolving nature of her disability.  *Feldman v. Am. Mem'l Life Ins. Co.*,

196 F.3d 783, 790 (7th Cir. 1999) ("the severity of a disability may change over time such

that an individual was totally disabled when she applied for SSDI, then later was a

---

[14]  Defendants argue that a part-time schedule was unreasonable.  "HCJFS has never
allowed a Program Technician 2 to work part time, for any reason."  (Doc. 139 at 15).  Had
Plaintiff requested a part-time schedule indefinitely, the Court may have been persuaded that
such an accommodation would cause an "undue hardship."  However, Plaintiff only asked for a
30 day accommodation, which appears reasonable on its face.

[15]  Defendants argue that this allegation is a fabrication, because, in 2008, SSA asked
Plaintiff to account for all work since March of 2006, and Plaintiff mentioned nothing about any
work in 2007 for Jobs Plus.  (Doc. 139, Ex. 58).  On this same document, Plaintiff informed SSA
that: (1) she had worked for FACS Group from December 10, 2007 through January 23, 2008 for
16 hours per week, but had to quit because of her medical condition; and (2) she worked for
Today's Staffing in March of 2006 for 20 hours per week, but had to quit because of her medical
condition.  (*Id.*)  Accordingly, Defendants maintain that Plaintiff has not worked more than a few
weeks since July 2004.  This is a disputed issue of fact.  Additionally, Defendants argue that it is
irrelevant whether Plaintiff could work in 2007, two years after her termination.  While the Court
agrees that Plaintiff's ability to work in 2007 is generally irrelevant, it does indicate that Plaintiff
was not permanently disabled.

qualified individual at the time of the employment decision disputed in an ADA suit.").[16]

The Court is troubled by the significant record evidence that Plaintiff was "totally disabled" from July 2004-2010.  (Doc. 139 at 5-12).[17]  However, given the conflicts in the medical and record evidence, and drawing all reasonable inferences in Plaintiff's favor, a jury could conclude that had Defendants allowed her to work part-time for 30 days in March or April of 2005, she would have been able to return to work.  (Doc. 142 at 9). Whether Plaintiff was permanently disabled, and the period during which she was disabled, are disputed issues of material fact.  Plaintiff presents sufficient facts to establish that she was qualified for her position, and estoppel principles do not preclude a jury from hearing her ADA claim.

### 2.    Legitimate, non-discriminatory reasons for termination

Once a plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employee's adverse employment action.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th

---

[16]  In *Feldman*, the Seventh Circuit emphasized that "the Court in *Cleveland* decided that judicial estoppel ought not apply merely because an individual has applied for or received SSDI benefits."  196 F.3d 783, 791.  Similarly, in *Motley v. New Jersey State Police*, the Third Circuit recognized *Cleveland's* holding that an application for SSDI benefits does not preclude an individual from being a qualified individual under the ADA.  196 F.3d 160, 164 (1999).  Like in *Feldman*, the court found for the defendant because the plaintiff did not attempt to explain the differences between his application for SSDI benefits and his ADA claim.  *Id.* at 166-67.

[17]  For example, Dr. Bingham averred that, as of July 9, 2004, Plaintiff was "totally disabled" from her regular and any other occupation.  (Doc. 144, Ex. 21).  On December 30, 2004, Dr. Bingham averred that Plaintiff continued to be "totally disabled."  (*Id.*, Ex. 27).  In May 2005, Dr. Lahnier averred to SSA that Plaintiff "can't expect herself to function in an environment like a state or federal welfare program."  (*Id.*, Ex. 42).

Cir. 2001) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). If the defendant carries this burden, the plaintiff must then "prove that the proffered reason was actually a pretext for invidious discrimination." (*Id.*)

Defendants have offered multiple non-discriminatory reasons for Plaintiff's termination. (*See* Doc. 139, Ex. 16).[18] Most compellingly, Defendants maintain that Plaintiff was terminated for a verbal altercation with her supervisor, Stephanie Smith, on June 30, 2004, during which Plaintiff accused her supervisor of losing several case records and called her a liar. (Doc. 94, Ex. E). Plaintiff refused to leave Ms. Smith's office, and continued to argue in a loud, aggressive, argumentative tone until a sheriff's deputy was summoned. (*Id.* at ¶¶ 7-13).[19] In fact, an independent arbitrator described Plaintiff's participation in the June 30 altercation as "confrontational, yelling, demanding, a 'madwoman,' argumentative, derogatory, disruptive, and disrespectful." He determined that the June 30 incident warranted termination in and of itself:

------

[18] Plaintiff was allegedly terminated for: (1) utilizing her position as an employee of the Department of Job and Family Services to conduct personal business on June 29, 2004; (2) a verbal altercation with her supervisor on June 30, 2004; (3) on July 2, 2004, she failed to notify her supervisor of her absence within a half-hour of her start time, and when she arrived to work at 4:00 p.m. and was told to leave by her supervisor, she refused to do so; (4) on July 9, 2004, she called her supervisor a liar; (5) on July 13 and 14, 2004, she failed to notify her supervisor of her absence within a half-hour of her start time; (6) on May 2, 3, and 4, 2005, she failed to report to work or to notify her supervisor of her absence within a half-hour of her start time. (*Id.*)

[19] In Plaintiff's application for SSDI benefits she admitted "at work I would lose documents or forget that I found something then accuse my supervisor of lying." (Doc. 139, Ex. 29).

> [The Grievant] should have known that her actions on June 30th would be totally unacceptable in her workplace and would violate fundamental, inherent standards of conduct on the job.  She should have known that her actions were so extraordinary that she was engaging in severe misconduct and that her actions could lead to discipline, including discharge.

(Doc. 92, Ex. E, Attachment 35 at 32-35).  Accordingly, Defendants have submitted sufficient evidence of a legitimate, non-discriminatory reason for Plaintiff's termination.

### 3. Whether Defendants' proffered reason for terminating Plaintiff was actually a pretext for discrimination

To establish pretext, a plaintiff must demonstrate "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  The first type of proof requires that Plaintiff show that the basis for the selection never happened or is factually false.  (*Id.*)  The second type of proof consists of a demonstration that "an illegal motivation was more likely than [the reasons] offered by the defendant."  (*Id.*)  The third type of proof consists of evidence that other non-disabled employees who were otherwise similarly situated to Plaintiff were not selected.  (*Id.*)  When an employer offers "multiple reasons for discharging a plaintiff, the plaintiff need only discredit one of the proffered reasons."  *Smith v. Good Samaritan Hosp.*, Case No. 1:06cv207, 2007 U.S. Dist. LEXIS 48304, at *19 (S.D. Ohio July 3, 2007).

-16-

Defendants allege that Plaintiff's confrontation with Ms. Smith constituted gross misconduct which allowed them to skip disciplinary steps before proceeding to termination. However, Joseph Gagliardo, Human Resources Manager for HCJFS, testified that Plaintiff's conduct should not have constituted "gross misconduct." (Doc. 119 at 16). Plaintiff, as a union employee, was subject to a progressive discipline policy including written warning, written reprimand, suspension, and termination. (*Id.* at 12). Pursuant to the contract, only conduct that would "put a child at risk" allows these steps to be skipped. (*Id.* at 16-17). Here, these steps were skipped, despite any indication that the alleged reasons for Plaintiff's termination would "put a child at risk." In fact, at the time Plaintiff went on leave in July 2004, Ms. Smith was not aware of any process or efforts to terminate Plaintiff for the June 30 incident. (Doc. 92 at 13-14). Ms. Smith did nothing to discuss the possibility of disciplining Plaintiff, although she had the authority to initiate discipline against her. (*Id.* at 57). Although Plaintiff worked after her confrontation with Ms. Smith, she did not receive a written warning or any other discipline short of termination as a result of the confrontation. (Doc. 103, Ex. 4 at ¶ 2; Doc. 120 at 30). Accordingly, Plaintiff argues that a jury could reject any reasons articulated by Defendants for which Plaintiff did not receive progressive discipline.

Defendants maintain that the determination of what constitutes gross misconduct must be made on a case-by-case basis. (Doc. 119 at 16-17). While Mr. Gagliardo noted that the contract alluded to an act that "put a child at risk" as being gross misconduct, the

CBA states that "[d]iscipline will be applied in a progressive and uniform manner, except in instances wherein the employee is found guilty of gross misconduct."  (Doc. 94, Ex. E). The CBA does not define "gross misconduct" or provide examples of what constitutes gross misconduct.  Moreover, Mr. Gagliardo played no role in Plaintiff's termination. (Doc. 119 at 11; Doc. 142 at 13).  The arbitrator, whose job it was to interpret the CBA and decide if Plaintiff's confrontation with her supervisor amounted to gross misconduct, determined that the June 30, 2004 incident warranted termination in and of itself.  (Doc. 94, Ex. E at 32-35).

Plaintiff also argues that her termination document ("Order of Removal") only included two incidents (June 29 and June 30) as the reasons for her termination.  (Doc. 120 at 21-22).  However, an Order of Removal must include all of the reasons for termination.  Defendants maintain that Plaintiff's original Removal Order, executed on July 6, 2005, did not include all the reasons for her termination due to a clerical error. (Doc. 94 at 6; Ex. E at ¶ 34).  At the direction of the arbitrator that heard Plaintiff's grievance of her termination, an Amended Order of Removal was executed on March 16, 2006.[20]  (Doc. 139, Ex. 16).  Still, a jury could conclude that the additional reasons were simply attempts by Defendant to manufacture reasons for Plaintiff's termination.[21]

---

[20] The Amended Removal Order cites seven incidents which allegedly  caused her termination.  (*See* Doc. 139, Ex. 16).

[21] Additionally, Plaintiff argues that Defendants failed to identify the decision maker, which proves pretext.  However, by statute, the decision maker is the Director of the HCJFS, and the Director signed off on the Orders of Removal.  (Doc. 143 at 2).

The conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the granting of summary judgment.  Although the Court struggled with this analysis, ultimately, the facts and inferences presented by Defendants do not sufficiently diminish the contrary evidence to the point that "it is so one-sided that [Defendant] must prevail as a matter of law."  *Anderson*, 477 U.S. at 252. Ultimately, the Court determines that Plaintiff has offered sufficient evidence toward establishing pretext.

**B.     Retaliation (Counts III, IV, VII)**[22]

Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee who has "opposed" any practice by an employer made unlawful under Title VII.  42 U.S.C. § 2000e-3(a).  It also prohibits retaliation against an employee who has "participated" in any manner in an investigation under Tile VII.  *Id.*

A *prima facie* case of retaliation requires a plaintiff to demonstrate that: (1) she engaged in activity protected by the ADA or ADEA; (2) the defendant knew of the exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's

---

[22]  Plaintiff claims that Defendant terminated her employment because of her protected activity in violation of FMLA (Count III), the ADA and Title VII (Count IV), and Ohio Revised Code Chapter 4112 (Count VII).  State and federal retaliation claims can be considered together - state law claims survive or fail with federal claims.  *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

-19-

protected activity and the adverse employment action.  *Barrett v. Whirlpool Corp.*, 556

F.3d 502, 516 (6th Cir. 2009).  The fourth prong is the only issue in dispute.

 In order to prove a causal connection, "plaintiff must simply produce evidence

sufficient to create an inference of causation.  Whether the two events happened in short

succession or whether a long period of time elapsed between them can be relevant to that

inquiry, but it is not dispositive."  *McCart v. Univ. of Cincinnati Found.*, No. 1:08cv656,

2010 U.S. Dist. LEXIS 34406, at *1, 16-18 (S.D. Ohio Apr. 7, 2010).  The Sixth Circuit

has repeatedly held that "cases that have permitted a *prima facie* case to be made based

on the proximity of time have all been short periods of time, usually less than six months.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (finding plaintiff did not

establish a *prima facie* case of retaliation and affirming summary judgment; "the fact of

temporal proximity alone was not particularly compelling, because the plaintiff's

retaliation case was otherwise weak, and there was substantial evidence supporting the

defendant's version of the events").[23]

 Plaintiff first requested accommodations under the ADA in May of 2003, filed

internal discrimination complaints in September 2003 and May 2004, and charges of

discrimination with the EEOC in June and December of 2004.  (Doc 93).  She used

---

 [23] *See, e.g., Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004)
(holding that the plaintiff established a causal connection when termination occurred within three
months of protected conduct). *Compare with Anderson v. Avon Prod., Inc.*, 340 Fed. Appx. 284,
288 (6th Cir. 2009) (no causal connection where six months separated the plaintiff's use of
FMLA leave and the adverse employment action).

FMLA leave in 2001 through 2004, the last occurrence on August 26, 2004.  (Doc. 94, Ex. A).  In August 2004, the physician to whom Defendants referred Plaintiff, determined in a "fitness for duty" examination that Plaintiff was unable to perform the essential functions of her job, placing her on medical leave.[24]  Then, on January 11, 2005, Plaintiff filed another charge with the OCR alleging retaliation.  Four days later, Defendants rejected Plaintiff's request to return to work part-time for a month and then full-time thereafter.  (Doc. 142 at 15).

Defendants argue that there is no evidence that any physician requested that Plaintiff be allowed to return to work part-time for a month in January 2005.  Rather, on January 10, 2005, Dr. Morse certified on Plaintiff's behalf that she was "healthy" and could return to work on January 17, 2005, with no restrictions.  (Doc. 94, Ex. A).  Additionally, Defendants point out that Plaintiff used FMLA leave from 2001 through 2003 with no consequence, and the disciplinary proceedings against Plaintiff, which included infractions for which she was ultimately terminated, were begun prior to her last FMLA leave.

Despite Defendants' argument to the contrary, Plaintiff has submitted sufficient facts to evidence that she was subjected to a series of adverse actions, each occurring after she engaged in protected activity.  As this Court previously held, these facts

---

[24]  Defendants argue that Dr. Cobb's evaluation cannot be considered an adverse action because Plaintiff herself requested a medical leave prior to Dr. Cobb's determination and Plaintiff's own physician confirmed the need for the leave.  (Doc. 94, Ex. E; Doc. 139, Exs. 1-3).

establish a triable issue as to a causal connection between the protected activity and the adverse employment action.  (*See* Doc. 106 at 27).

For the reasons articulated in Sections V.A.2-3, Defendants has established a legitimate, nondiscriminatory reasons for termination and Plaintiff has alleged sufficient facts from which a jury could infer pretext.  Accordingly, Plaintiff's claims for retaliation survive.

### C.        Backpay, Front Pay, and Reinstatement

Finally, Defendants argue that Plaintiff cannot recover back pay, front pay, or reinstatement, because she was found totally and permanently disabled by the SSA and OPERS as of July 2004 and February 2005, respectively, dates which pre-date her termination.  "We find it anomalous that an employee can claim to be permanently and totally disabled, obtain a certification to that effect, and collect sickness and disability payments, and, at the same time, seek to force his employer to reinstate him to his former position with back pay for time lost."  *Brotherhood of R.R Signalmen v. Louisville & Nashville R.R. Co.*, 688 F.2d 535, 537 (7th Cir. 1982).[25]  While this Court does not disagree, whether Plaintiff was totally disabled to the point that she could not work with a reasonable accommodation is a disputed issue of fact.[26]  Accordingly, until a jury considers the conflicting evidence, the Court cannot make a determination on this issue.

---

[25] *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 401 (3rd Cir. 1976) (periods when a plaintiff is unemployable because of illness should be deducted from backpay).

[26] This issue was discussed in the Court's previous decision.  (*See* Doc. 106 at 34) ("Whether Plaintiff was disabled prior to her termination is a disputed issue of material fact which precludes summary judgment as to the amount recoverable for lost pay.").

## V.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Doc. 139) is **DENIED**.

**IT IS SO ORDERED.**

Date:  May 29, 2012                                         _____*s/ Timothy S. Black*_____
                                                            Timothy S. Black
                                                            United States District Judge

-23-